**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------X
GENERAL ELECTRIC CAPITAL CORPORATION, :
a Delaware Corporation

                      :

              Plaintiff,       **REPORT & RECOMMENDATION**

                      :

      -against-          **11 Civ. 3671 (ALC)(MHD)**

                      :

WILLIE E. GARY, a resident of Florida,
GARY WILLIAMS, FINNEY, LEWIS, WATSON  :
AND LEWIS, P.L., a Florida
corporation, GARY 737 LLC, a Florida  :
limited liability company, and
SUSSMAN & WATKINS, a New York          :
partnership

                      :

            Defendants.
---------------------------------------X

**TO THE HONORABLE ANDREW L. CARTER, JR., U.S.D.J.:**


     Plaintiff General Electric Capital Corporation ("GECC")
commenced this lawsuit to recover moneys owed to it on a loan made
to defendant Gary 737 LLC for the purchase of a Boeing 737
aircraft. Following default on the loan, plaintiff filed suit
against Gary 737 LLC, as well as guarantor Willie E. Gary and Mr.
Gary's law firm. In view of defendants' admission to having
defaulted on the loan (see Stipulation entered Nov. 22, 2011), we
now conduct an inquest to assess damages owed by defendants to
plaintiff.

1

Defendants have raised no objections to the amounts of principal, interest, and late charges that are owed; however, they argue (1) that they are entitled to a set-off because plaintiff unreasonably withheld its consent to a sub-lease of the collateralized aircraft, thereby impeding defendants' repayment of the loan, and (2) that plaintiff's request for an award of attorney's fees is inflated and unreasonable.

Based on the evidence adduced at a hearing conducted on April 9, 2012, and in the parties' post-hearing briefing, we conclude that judgment should be entered in favor of plaintiff in the amount of $3,074,728.09 in principal, $465,730.50 in interest as of April 9, 2012, $51,973.24 in late charges, $111,667.73 in fees and $3,263.58 in expenses.

I.   The Factual Background

A.   The Loan

On July 31, 2000, Boeing 226260 Holdings, Inc. ("Boeing") and CIT Group/Equipment Financing, Inc. ("CIT") entered into an agreement embodied in two documents, the Secured Term Promissory Note and the Loan Agreement. Under the terms of the agreement, CIT

loaned Boeing $9,367,460.00 to purchase and upgrade a Boeing 737 aircraft for use by Mr. Gary and his law firm, Gary, Williams, Finney, Lewis, & McMannus. (Pl.'s Post-Inquest Exs. 1 & 2; Tr. 6). Boeing agreed to make 180 consecutive fixed monthly payments of $98,780.53, followed by a balloon payment of $4,722,616.39. (Pl.'s Post-Inquest Ex. 2 § 3). It also agreed to cover CIT's costs and expenses, including attorney's fees. (Id. Ex. 2 at § 13; Tr. 9).

Boeing and CIT also entered into a Security Agreement, which granted CIT a security interest in the Boeing 737 aircraft ("the Aircraft") that was to be purchased with the loan. (Pl.'s Post-Inquest Ex. 3). The Security Agreement included several provisions that restricted the borrower's ability to transfer rights under the agreement. Section 5.01 of the Security Agreement stated, in general terms, that "the Borrower may not assign or transfer any of its rights under this Agreement without the prior written consent of the Secured Party." More specifically, the Security Agreement prohibited the transfer of any rights in the Aircraft (id. Ex. 3 at § 3.14(c)) or in any part of the Aircraft, without the lender's prior written consent. (Id. Ex. 3 at § 3.24). In addition, the Security Agreement provided that all covenants would be binding on each party and its successors and assigns. (Id. Ex. 3 at § 5.01). In the event of a default on the loan, the Security Agreement

3

stipulated, _inter alia_, that "[a]ll reasonably necessary costs and expenses incurred by the Secured Party in connection with enforcement and/or exercise of any of its rights or remedies herein shall be immediately payable by the Borrower, upon demand." (_Id._ Ex. 3 at § 4.02(e)).

As further protection to the lender, defendant Mr. Gary executed a Loan Guaranty Agreement, under which he guaranteed Boeing's debt to CIT. (_Id._ at Ex. 4). In the event of a default on the loan, Mr. Gary also agreed to pay the costs of collection, including reasonable attorney's fees. (_Id._ Ex. 4 at § 18). He further agreed that his obligations under the Guarantee Agreement would not be subject to reduction, limitation, impairment, or termination for any reason, including any asserted right to a set-off. (_See_ _id._ Ex. 4 at § 4).

On July 30, 2003, Boeing assigned all of its rights, duties, and obligations under the Promissory Note, the Original Loan Agreement, and the Security Agreement to the defendant Gary 737, LLC. (_Id._ at Ex. 5). Subsequently, on August 12, 2005, CIT assigned all of its rights under the various loan documents to plaintiff GE Capital. (_Id._ at Ex. 6).

4

B. Restructuring and Modifying the Loan Agreement

In 2009, defendants approached plaintiff seeking to restructure the terms of the loan, due to economic difficulties that defendants were experiencing. (Tr. 14). On May 29, 2009, the parties entered into an agreement ("Amended Promissory Note") to modify the terms of the Promissory Note. (Pl.'s Post-Inquest Ex. 7). At the time, the outstanding principal balance on the loan was $3,405,638.53. (Id. Ex. 7 at 1). Under the terms of the Amended Promissory Note, defendants' monthly payments were reduced to $25,000.00 for a period of seven months, to be followed by twenty-two monthly payments of $98,780.50 and a final balloon payment. (Id. Ex. 7 at 1-2). In a Restructuring and Security Agreement, defendants further agreed to pay "all expenses incurred in collection, including Lender's actual attorney's fees." (Id. Ex. 8 at § 7). The defendants also reaffirmed their obligations as set forth in the original loan documents. (Id. Ex. 8 at §§ 3, 4). Under the Restructured Security Agreement, the law firm Gary, Williams, Finney, Lewis, Watson & Sperando, P.L. pledged additional collateral, consisting of $1,000,000.00 in anticipated attorney's fees associated with two specific lawsuits. (Id. Ex. 8 at § 2; Tr. 19-20).

On March 31, 2010, the parties once again agreed to modify the loan ("2010 Modification Agreement"), providing for a revised schedule of payments under the Amended Promissory Note. (Pl.'s Post-Inquest Ex. 9). Under the terms of the 2010 Modification Agreement, defendants were to make five monthly payments of $25,000.00, followed by six monthly payments of $50,000.00, then eight monthly payments of $98,780.50, to be followed by a balloon payment of all outstanding debt, fees, costs and expenses owed to GECC. (Id. Ex. 9 at §§ 9(a)-(d)). The defendant law firm pledged additional anticipated attorney's fees as collateral for the loan. (Id. Ex. 9 at § 2; Tr. 19-21).

Despite the numerous modifications to facilitate defendants' repayment of the loan, as of April 9, 2012, when the inquest hearing was conducted, defendants owed $3,074,728.09 in outstanding principal alone. (Tr. 27). Documentation and testimony from the inquest hearing reflects that accumulated unpaid interest as of April 9, 2012 amounted to $465,730.50, with late charges totaling $51,973.21. (Pl.'s Post-Inquest Ex. 10; Tr. 27-28).

C.    Requests to Lease the Aircraft

Before defendants approached plaintiff seeking a modification

6

to the loan, they sought to obtain plaintiff's consent to several proposed sub-leases of the Aircraft. In each case, plaintiff refused to grant its consent. Accordingly, defendants now argue that they are entitled to a set-off, presumably because they believe that plaintiff failed to mitigate its damages by denying defendants a potential source of cash-flow that could have serviced the loan.

On June 15, 2008, a representative of Gary's law firm, Keith Swirsky, contacted GECC seeking GECC's consent to a sub-leasing of the Aircraft to a Swiss entity, Savfin Air. Shortly thereafter, Swirsky revised defendant's request, substituting JP Air OU as the proposed sub-lessee. Defendants provided GECC with a draft lease agreement setting forth the terms of the proposed sub-lease, which included monthly payments of $120,000.00. (Tr. 86; Pl.'s Post-Inquest Ex. 12).

On July 23, 2008, a representative of GECC contacted the broker for the proposed sub-lease, seeking further information concerning (i) the identity of the ultimate lessor in the arrangement; (ii) whether JP Air OU was operating as a special purpose entity for a charter company; and (iii) the reason for JP Air OU's incorporation in Estonia, when the proposed lease

7

contemplated that the aircraft would be hangared in Dubai. (Def.'s Ex. M). Plaintiff also requested copies of JP Air OU's articles of incorporation, ownership information, and information concerning the company's principals. (Id.).

In his August 28, 2008 answer to plaintiff's query, the broker responded tersely, noting that JP Air Ou had been established in Estonia "because of tax reasons" and because Estonia had a "first class world wide recognized European EASA AOC." (Def.'s Ex. N). In lieu of providing the requested corporate documents, the broker sent GECC a link to the JP Air OU website and offered his endorsement of JP Air OU's owner's experience in cargo movements. (Id.). Plaintiff reports that it received no additional information from defendants concerning JP Air OU. (Tr. 11).

On September 3, 2008, GECC emailed defendants, notifying them that it did not consent to sub-leasing the aircraft to JP Air OU. (Def.'s Ex. O). GECC's representative indicated that if Mr. Gary wished to lease the aircraft, he could either provide a letter of credit for the outstanding balance, "pay off the note on the Aircraft, or seek alternate funding." (Id.). In explaining GECC's refusal of consent to the JP Air OU lease, GECC's representative testified that GECC's experience was limited to financing aircraft

hangared and operated within the United States and registered with the Federal Aviation Administration. He further stated that if the aircraft had been stationed in Dubai and registered to an Estonian company, it would cease to have any value as collateral to GECC. (Tr. 113).

In March 2009 defendants approached plaintiff with a second proposed lease of the Aircraft, this time to a company called Propjet, which apparently intended to sub-lease the Aircraft to another entity, Starjet. (Id. at 104). As before, GECC requested certain financial information about the potential lessee and sub-lessee, including three years of financial statements and tax returns. On March 13, 2009, plaintiff sent defendants' representative an email advising that such financial information was necessary for plaintiff to evaluate the proposal. (Pl.'s Post-Inquest Ex. 12). Nonetheless, defendants failed to provide any such information, and their representative did not inquire further regarding the proposed Propjet/Starjet deal. (Tr. 105-06).

Plaintiff subsequently prepared an internal memorandum that summarized its reasons for rejecting the proposed Propjet/Starjet lease and sub-lease. It stated that defendants' application had been rejected because (1) defendants had refused to provide the

9

documents that GECC requested as part of its normal due diligence process; (2) defendants' representative had refused to allow GECC to speak directly with representatives from either Propjet or Starjet; and (3) defendants' representatives had later informed plaintiff that they did not wish to continue with the transaction. (Pl.'s Post-Inquest Ex. 13).

## II.   Analysis

### A.   The Set-Off Issue

Defendants acknowledge that the terms of the loan agreement between the parties prohibited defendants from leasing or otherwise transferring control of the aircraft without prior written consent from GECC. Defendants assert, however, that they proposed to plaintiff a reasonable leasing arrangement with JP Air OU, which would have paid plaintiff $120,000.00 per month, an amount exceeding defendants' monthly payment obligation under the terms of the parties' loan agreement. Accordingly, defendants argue that they are entitled to a set-off of the amounts that would have been realized under the proposed leasing agreement with JP Air OU, but for plaintiff's allegedly unreasonable refusal of consent to the

agreement. For the reasons set forth below, defendants' argument cannot stand.

First, the Loan Guarantee Agreement explicitly specified that defendants waived any right to assert a set-off in the event of a default. (<u>Id.</u> Ex. 4 at § 4). This alone is a sufficient basis to reject defendants' theory.

Second, the Loan Agreement and subsequent loan documents specified that any assignment, lease or other transfer of any interest in or possession of the Aircraft or any of its parts required prior written approval by the lender. Notably, the agreement did not require the lender to have a reasonable basis for withholding such consent (<u>see id.</u> Ex. 3 at § 3.14(c)), and under New York law, when "a contract negotiated at arm's length lacks specific language preventing plaintiff from unreasonably withholding consent, the Court can not and should not rewrite the contract to include such language which neither of the parties saw fit to insert in the contract." <u>Teachers Ins. & Annuity Ass'n of Am. v. Wometco Enters., Inc.</u>, 833 F. Supp. 344, 349 (S.D.N.Y. 1994); <u>see</u>, <u>e.g.</u>, <u>State St. Bank & Trust Co. v. Inversiones Errazuiriz Limitada</u>, 374 F.3d 158, 170 (2d Cir. 2004) (addressing a bank's right to unreasonably

withhold consent under a credit agreement); <u>United States v.</u>
<u>Epstein</u>, 27 F. Supp. 2d 404, 413 (S.D.N.Y. 1998) (addressing
landlord's ability to arbitrarily withhold consent to sub-lease of
real estate). Indeed, absent an explicit requirement that any
withholding of consent must be reasonable, a provision requiring a
lessor's prior consent will be interpreted to allow the refusal of
consent "for any reason or no reason." <u>Dress Shirt Sales, Inc. v.</u>
<u>Hotel Martinique Assocs.</u>, 12 N.Y.2d 339, 342, 239 N.Y.S.2d 660, 662
(1963); <u>see</u> <u>also</u> <u>Sharma v. Chem. Bank</u>, 723 F. Supp. 200, 201-02
(S.D.N.Y. 1989); <u>Lippman v. Dime Savings Bank of New York, FSB</u>, 262
A.D.2d 52, 53, 691 N.Y.S.2d 437, 438 (1st Dep't 1999).

In this case, defendants agreed under the Security Agreement
that they would "not directly or indirectly assign, convey or
otherwise transfer any of [their] right, title or interest in the
Collateral without the prior written consent of the Secured Party,"
(Pl.'s Post-Inquest Ex. 3 § 3.14(c)) and that, without prior consent
of plaintiff, they would not "transfer any right, title, or interest
in Airframe, Engine, or any Part." (<u>Id.</u> Ex. 3 at § 3.24). These
provisions were unconditional and did not limit the lender's right
to refuse consent to such a transfer, unreasonably or otherwise. We
note that these terms were reincorporated in the successor versions

12

of the parties' loan agreement. (See id. Ex. 8 at § 4, Ex. 9 at § 5). Plaintiff acted within its contractual rights in refusing to consent to defendants' various leasing proposals. Since defendants do not allege any legal or factual basis for invalidating the loan agreement, they are bound by the terms of their contract and are not entitled to any set-off of damages.

As an aside, we note that, even if the parties' agreement had included a requirement that plaintiff could not unreasonably withhold consent to a proposed lease, defendants still would not be entitled to a set-off because, under the circumstances, plaintiff's conduct was entirely reasonable. In assessing the reasonableness of a party's withholding of consent for a sub-lease, courts will consider (a) the proposed sub-lessee's financial responsibility, (b) the "identity" or "business character" of the sub-lessee, (c) the legality of the proposed use and (d) the nature of the use or occupancy. See Am. Book Co. v. Yeshiva Univ. Dev. Found., Inc., 59 Misc.2d 31, 33-34, 297 N.Y.S.2d 156, 160 (Sup. Ct. 1969). The "subjective concerns and personal desires" of a lessor are not taken into account in assessing the lessor's decision to withhold consent; rather, the lessor's decision must be judged by an objective standard. See Sayed v. Rapp, 10 A.D.3d 717, 720, 782 N.Y.S.2d 278,

13

281 (2d Dep't 2004); Astoria Bedding, Mr. Sleeper Bedding Ctr. Inc.
v. Northside P'ship, 239 A.D.2d 775, 776, 657 N.Y.S.2d 796, 797 (3d
Dep't 1997); Ontel v. Helasol Realty Corp., 130 A.D.2d 639, 640, 515
N.Y.S.2d 567, 568 (2d Dep't 1987).


　　　Given these criteria, plaintiff cannot be said to have acted
unreasonably in refusing consent to either of the proposed leases
of the Aircraft. When advised of the possible lease to Safvin,
which was subsequently recast as a proposed lease to JP Air Ou,
GECC requested essential financial information and other background
documentation about the proposed lessee, as well as an explanation
as to why the arrangement involved a Estonia-based company with the
aircraft to be located in Dubai. Defendants did not provide
plaintiff with the requested information. Instead, defendants'
representative simply directed plaintiff to JP Air Ou's website,
volunteered its own opinion that the proposed lessee was reliable,
and provided the unenlightening explanation that JP Air Ou was
based in Estonia for "tax" reasons. Defendants' failure to provide
"timely [and] adequate information" about a proposed lessee is
itself a proper basis to refuse consent because defendants did not
provide plaintiff with sufficient information from which to
ascertain whether the proposed lessee was likely to be financially

14

responsible. See 200 Eighth Ave. Rest. Corp. v. Daytona Holding Corp., 293 A.D.2d 353, 353, 740 N.Y.S.2d 330, 331 (1st Dep't 2002). Such failure by defendants to cooperate with plaintiff's effort at due diligence fully justified GECC's refusal of consent to the proposed lease.

Even if defendants had provided plaintiff with adequate information and documentation on which to independently assess JP Air Ou's financial security and responsibility, plaintiff still might have reasonably refused consent to the lease in view of the fact that, by relocating the Aircraft to Dubai under the supervision of an Estonian company, the arrangement would have made it more difficult for plaintiff to repossess the Aircraft, which served as collateral securing defendants' loan. In short, to consent to the proposed lease would have exposed GECC to far greater risk than it originally faced under the operative loan arrangements, and GECC was fully justified in refusing to consent to such a proposal.

As for the second proposed leasing/sub-leasing agreement, we conclude that defendants failed to provide plaintiff with any meaningful information that could have informed plaintiff of the

financial viability of the proposed arrangement. As with the first proposal, we conclude that plaintiff acted reasonably in refusing its consent to defendants' request.

In sum, there is no basis to allow defendants a set-off on the amounts that they owe under the loan and guarantee agreements.

B.    Attorneys' Fees

Plaintiff has asserted a claim for fees and expenses in the amount of $114,931.31, of which $111,667.73 represents fees incurred (1) in dealing with the various amendments of the loan payment schedules and (2) in pursuit of GECC's contractual remedies for defendants' default. Defendants argue that the fee request is unreasonable because the amount of legal work required by the case is far less than what would justify such a substantial fee.

The parties' original loan agreement entitled plaintiff to "reasonable" fees and actual expenses in connection with the preparation of the loan documents and the enforcement of its rights in the event of a default. (See Pl.'s Post-Inquest Ex. 2 § 7(a)). However, this term was subsequently modified by the parties,

16

rendering defendants responsible for fees and expenses actually incurred by plaintiff. (See id. Ex. 3 at § 4.02(e)). Plaintiff nonetheless submits that its request for fees and expenses should be assessed under a reasonableness standard, typically referred to as a lodestar analysis. (Pl. Post-Inquest Mem. at ¶ 24); see, e.g., AXA Inv. Mgrs. UK Ltd. v. Endeavor Cap. Mgt. LLC, 2012 WL 6217168, *1 (S.D.N.Y. Dec. 6, 2012) (applying lodestar analysis to contractual award of fees and expenses).

In determining a "presumptively reasonable fee," Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany, 522 F.3d 182, 190 (2d Cir. 2008), the court takes into account "(1) a consideration of the number of hours actually spent by counsel and other personnel that are deemed reasonably necessary to the successful outcome for the client and (2) the setting of reasonable hourly rates for counsel, a criterion most recently, if opaquely described as 'the rate a paying client would be willing to pay.'"[1] Briese Lichttechnik Vertriebs GmbH v. Langton, 2011 WL 4756252, at

_____

[1] In a recent opinion the Supreme Court has articulated a somewhat different description of what the goal of the analysis is, albeit in the context of a civil rights case, when it said that "a 'reasonable' fee is a fee that is sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case." Perdue v. Kenny A., 130 S. Ct. 1662, 1672 (2010).

17

*1 (S.D.N.Y. Oct. 7, 2011) (quoting Briese Lichttechnik Vertriebs GmbH v. Langton, 2010 WL 3958737, at *1 (S.D.N.Y. Oct. 4, 2010)). The resulting figure, commonly referred to as the lodestar,[2] is not "conclusive in all circumstances," but "there is 'a strong presumption' that the lodestar figure is reasonable." Perdue, 130 S. Ct. at 1673; accord Millea, 658 F.3d at 166.

In determining how much attorney time should be compensated, the court looks to the amount of time spent on each category of tasks, as reflected in contemporaneous time records, e.g., Malletier v. Dooney & Bourke, Inc., 2007 WL 1284013, at *1 (S.D.N.Y. Apr. 24, 2007) (citing New York Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1142-43, 1147 (2d Cir. 1983)), and then, to the best of its ability, should determine how much of that time was "reasonably expended." Id. (internal quotations omitted). To do so "the court looks to its own

---

[2] The term "lodestar" has recently had a somewhat up-and-down fate in the Second Circuit. After years of usage of this term, the Second Circuit seemed to banish it in the series of Arbor Hill opinions, see Arbor Hill, 522 F.3d at 188-90, but it has since made a comeback after the Supreme Court utilized it in 2011 without questioning its appropriateness as a descriptor of the required fee analysis. Perdue, 130 S. Ct. at 1672-73; see also Millea v. Metro-N. R.R. Co., 658 F.3d 154, 166-69 (2d Cir. 2011); Blessing v. Sirius XM Radio Inc., 2012 WL 6684572, *2 (2d Cir. Dec. 20, 2012); Lucerne Textiles, Inc. v. H.C.T. Textiles Co., Ltd., 2013 WL 174226, *5 (S.D.N.Y. Jan. 17, 2013).

familiarity with the case and... its experience generally as well as to the evidentiary submissions and arguments of the parties." Clarke v. Frank, 960 F.2d 1146, 1153 (2d Cir. 1992) (internal quotations omitted). If the court finds that some of the time spent was not reasonably necessary to the outcome, it should reduce the time for which compensation is awarded. See, e.g., Hensley v. Eckerhart, 461 U.S. 424, 433-37 (1983); Gierlinger v. Gleason, 160 F.3d 858, 876 (2d Cir. 1998). Such reductions are appropriate not only for work on unsuccessful claims and arguments, but also for inefficient or duplicative work. See Hensley, 424 U.S. at 434-35; In re Agent Orange Prod. Liab. Litig., 818 F.2d 226, 237 (2d Cir. 1987). "In reducing a claim for time spent, the court may 'use a percentage deduction "as a practical means of trimming fat from a fee application."'" Malletier, 2007 WL 1284013, at *1 (quoting McDonald v. Pension Plan of the NYSA-ILA Pension Trust Fund, 450 F.3d 91, 96 (2d Cir. 2006)).

     To determine an appropriate hourly rate, the court initially "looks to 'the prevailing market rates in the relevant community.'" Perdue, 130 S. Ct. at 172 (quoting Blum v. Stenson, 465 U.S. 886, 895 (1984)). This traditional rule requires the court to look to rates "prevailing in the community for similar services by lawyers

of reasonably comparable skill, experience and reputation." Blum, 465 U.S. at 895 n.11; see also McDonald, 450 F.3d at 96. Recently the Second Circuit has suggested that the court should engage in a somewhat broader and more variegated analysis, under which it not only looks to the community-based measure of rates, but also takes into consideration a broader array of factors, first proposed by the Fifth Circuit in Johnson v. Ga. Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974), in order to arrive at a presumptively reasonable fee.[3] According to Arbor Hill, the aim is to arrive at a rate that "a paying client would be willing to pay," with the court expected to "bear in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case

---

[3] The court in Johnson invoked a series of twelve factors to inform a reasonable-fee determination, including:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

Arbor Hill, 522 F.3d at 186 n.3 (citing Johnson, 488 F.2d at 717-19).

effectively." 522 F.3d at 190; see Simmons v. N.Y.C. Transit Auth., 575 F.3d 170, 174 (2d Cir. 2009).

In this case, plaintiff seeks reimbursement for approximately 373 hours of legal work by an array of senior and junior attorneys from 2008 to 2012, at hourly rates ranging from $300.00 to $440.00, although the top rates were reduced to $300.00 in 2009. (See Pl.'s Post-Inquest Ex. 11 at 47; Tr. 51). As for expenses, they reflect modest amounts for travel, copying, filing fees and related matters. (See Pl.'s Post-Inquest Ex. 11 at 47).

Defendants do not challenge the hourly rates at which counsel billed plaintiff. Rather, they assert that the fees are unreasonable because the amount of legal work warranted by the nature of the case seems disproportionate to the amount of work allegedly performed. (Def.'s Post-Inquest Brief 12). In particular, defendants rely on the facts that they conceded liability at the first court conference and that there have been no depositions or other discovery taken in this lawsuit.[4] In response, plaintiff notes

---

[4] Defendants also claim that had plaintiff genuinely wished to resolve this case, it would have joined this case to a similar action by another creditor brought in the Northern District of New York. (Def.'s Post-Inquest Brief, 12). Defendants are presumably suggesting that plaintiff is incurring unnecessary

that defendants do not specify any time entries or work done by
plaintiff's attorneys' that is unreasonable, and observes that the
work involved more than simply litigating this case. (Pl.'s Post-
Inquest Brief 9). We agree that defendants' largely pro forma
criticism of the fee total is unconvincing.

The work reflected in the billings extended beyond "merely
drafting a complaint and appearing for a court conference." (Tr.
51-56). The law firm was involved in negotiating and drafting a
series of restructuring agreements, and it later engaged in
settlement efforts, as well as preparing the ground for a
successful litigation of GECC's claims. (Tr. 59).

An examination of the attorneys' billing report reveals that
the attorneys spent time reviewing the existing loan documents,
negotiating and drafting the new restructuring documents,
communicating with other lawyers and with defendants'

---

fees by litigating this claim separately in this district.
Although efficiency is a laudable goal, plaintiff is entitled to
bring its case in the forum that it deems most convenient and
appropriate. See Dornoch Ltd. ex rel. Underwriting Members of
Lloyd's Syndicate 1209 v. PBM Holdings, Inc., 666 F. Supp. 2d
366, 372 (S.D.N.Y. 2009); Schmidt v. Am. Flyers Airline Corp.,
260 F. Supp. 813, 815 (S.D.N.Y. 1966). There is no legal basis
for barring recovery of attorney's fees based on this argument.

representatives in person as well as over the phone and via email, performing legal research and analysis, discussing the case with their client and, finally, drafting the necessary pleading (including an amended complaint), attending several pretrial conferences and otherwise pursuing the case through to the damages hearing. (Pl.'s Post-Inquest Ex. 13) In addition, plaintiff's counsel significantly discounted the otherwise defensible hourly rates of its senior attorneys for a large part of the time they worked, thereby mitigating any doubts about the number of hours reasonably expended.

In sum, based upon our review of plaintiff's attorneys' billable hours, and in the absence of any specific or persuasive critique of the hours by defendants, we conclude that the time spent and the total of the fees charged are not unreasonable. As for the disbursements, defendants do not address them, and we conclude that they are also reimbursable under the contract.

CONCLUSION

For the reasons stated, we recommend that judgment be entered in favor of plaintiff GECC awarding it $3,074,728.09 in principal,

$465,730.50 in interest as of April 9, 2012, $51,973.24 in late charges, $111,667.73 in attorney's fees, and $3,263.58 in expenses. Otherwise stated, judgment should be entered for plaintiff in the sum of $3,607,363.14.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Andrew L. Carter, Jr., and to the chambers of the undersigned. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See Thomas v. Arn, 474 U.S. 140, 150 (1985); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

DATED: New York, New York
       January 31, 2013

                                        )

                                   _____
                                   MICHAEL H. DOLINGER
                                   UNITED STATES MAGISTRATE JUDGE


24

Copies of the foregoing Report and Recommendation have been sent today to:

David Kochman, Esq.
Reed Smith
599 Lexington Avenue
New York, NY 10022

Michael Howard Sussman, Esq.
Sussman & Watkins
55 Maine Street, Suite 6
P.O. Box 1005
Goshen, New York 10924